**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

MICHELE MAURO-TARTAGLIA,

                                        Plaintiff,

          v.                                              No. 1:16-CV-511
                                                           (CFH)

TINA MAXIAN, M.D.; SCHENECTADY
REGIONAL ORTHOPEDIC
ASSOCIATES, P.C.,

                                        Defendants.
_____

**APPEARANCES:**                      **OF COUNSEL:**

Girvin, Ferlazzo Law Firm             SALVATORE D. FERLAZZO, ESQ.
20 Corporate Woods Blvd.              MIKHAIL SHAH, ESQ.
Albany, New York 12211-2350
Attorneys for plaintiff

Napierski, Vandenburgh Law Firm       SHAWN F. BROSSEAU, ESQ.
296 Washington Ave. Extension         DIANE LUFKIN SCHILLING, ESQ.
Albany, New York
Attorneys for defendants

Thorn, Gershon Law Firm               PAUL D. JURELLER, ESQ.
5 Wembley Court, New Karner Road
P.O. Box 15054
Albany, New York 12212-5054
Attorneys for nonparty Ellis Hospital

## MEMORANDUM-DECISION & ORDER

Presently pending before the Court[1] is plaintiff Michele Mauro-Tartaglia's motion for

a new trial pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 59.  Dkt. No. 78.

_____

[1] Parties consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c).  Dkt. No. 43.

For the reasons set forth herein, plaintiff's motion is denied.

## I. Background

In this case, plaintiff alleged medical malpractice against defendant Tina Maxian, M.D., for failure to provide informed consent and deviations from the standard of care, and for vicarious liability against defendant Schenectady Regional Orthopedic Associates, P.C. Dkt. No. 29. On April 9, 2019, the jury rendered a verdict. Dkt. No. 76. On the verdict sheet, the jury answered "yes" in response to question one, asking "[d]id defendants provide appropriate information to plaintiff Michele Mauro-Tartaglia before obtaining her consent to perform the reconstructive surgery of her left lapidus, left gastroc slide, and left claw toe correction 2, 3, and 4?" Id. at 1. In response to question four, which asked "[w]ere defendants negligent in providing services during the operation of January 2, 2014 relating to the left lapidus bunionectomey procedure?", the jury answered "no." Id. at 3. In response to question six, asking "[w]ere defendants negligent in providing services during the operation of January 2, 2014 relating to the hammer toe corrections for toes 2, 3, and 4?", the jury answered "yes." Id. The jury responded "no" to question seven, which asked, "[w]as defendants' conduct a substantial factor in causing harm to plaintiff." Id. at 3. The jury also answered "no" to question eight, asking "[w]ere defendants negligent in providing post-operative treatment?" Id.

On April 22, 2019, plaintiff filed this motion for a new trial. Dkt. No. 78. Defendants opposed. Dkt. No. 80. Plaintiff filed a reply. Dkt. No. 82. The parties appeared for oral argument on May 21, 2019. See Tex. Min Ent. dated 5/21/19. For the reasons that follow

plaintiff's motion to vacate and set aside the verdict and for a new trial pursuant to Fed. R.

Civ. P. 59. is denied.


## II. Legal Standard

Rule 59(a)(1)(A) provides that "[a] new trial may be granted . . . for any of the

reasons for which new trials have heretofore been granted in actions at law in the courts of

the United States." FED. R. CIV. P. 59(a)(1)(A). As this Court has set forth

> "The standard for granting a new trial under Rule 59 is less
> stringent [than under Rule 50], but still relatively high." Stern v.
> Shammas, No. 12-CV-5210, 2015 WL 6440647, at *2 (E.D.N.Y.
> Oct. 21, 2015), aff'd sub nom. Stern v. City of New York, 665 F.
> App'x 27 (2d Cir. 2016) (quoting Starr Indem. & Liab. Co. v. Am.
> Claims Mgmt., 131 F. Supp. 3d 185, 188 (S.D.N.Y. 2015)).
> "Rule 59 is not a vehicle for relitigating old issues, presenting
> the case under new theories, securing a rehearing on the
> merits, or otherwise taking a second bite of the apple." Carlson
> v. Parry, No. 06-CV-6621P, 2013 WL 5354517, *5 (W.D.N.Y.
> Sept. 24, 2013) (quoting Kogut v. Cty. of Nassau, 2013 WL
> 3820826, *2 (E.D.N.Y. July 22, 2013)).

> Generally, the grounds for a new trial are that "(1) the verdict is
> against the clear weight of the evidence; (2) the trial court was
> not fair; (3) substantial errors occurred in the admission or
> rejection of evidence or the giving or refusal of instructions to
> the jury; or (4) damages are excessive." Dedjoe v. Esper, No.
> 15-CV-1170, 2019 WL 697821, at *1 (N.D.N.Y. Feb. 19, 2019)
> (McAvoy, J.) (quoting Lawson v. Cty. of Suffolk, 920 F. Supp.
> 2d 332, 339 (E.D.N.Y. 2013)). "A district court should grant a
> new trial motion if it 'is convinced that the jury has reached a
> seriously erroneous result or that the verdict is a miscarriage of
> justice.'" United States v. Landau, 155 F.3d 93, 104 (2d Cir.
> 1998) (quoting Smith v. Light[n]ing Bolt Productions, Inc., [861
> F.2d 363, 367 (2d. Cir. 1988]); see Raedle v. Credit Agricole
> Indosuez, 670 F.3d 411, 417-18 (2d Cir. 2012).

> Such a motion may be granted "even if there is substantial

> evidence to support the jury's verdict." <u>Landau</u>, 155 F.3d at 104.
> Though a trial judge "is free to weigh the evidence himself, and
> need not view it in the light most favorable to the verdict winner,'
> <u>DLC Mgmt. Corp. v. Town of Hyde Park</u>, 163 F.3d 124, 134 (2d
> Cir. 1998), a jury's verdict should "rarely be disturbed."  <u>Farrior
> v. Waterford Bd. of Educ.</u>, 277 F.3d 633, 635 (2d Cir. 2002)
> (per curiam); <u>see</u> <u>also</u> <u>Carroll v. Cty. of Monroe</u>, 712 F.3d 649,
> 653 (2d Cir. 2013); <u>Raedle</u>, 670 F.3d at 417-18.

<u>Del Pesce v. Ingraham</u>, 9:16-CV-818 (DEP), 2019 WL 2462275, at *2-3 (N.D.N.Y. June

13, 2019).

"The task before the court is to balance 'respect [for] the jury's findings . . . with

avoidance of miscarriage of justice and' the court may only grant a new trial if, after viewing

all the evidence, it has 'a definite and firm conviction that a mistake has been committed.'"

<u>Dolberry v. Jakob</u>, No. 9:11-CV-1018 (DNH/DEP), 2019 WL 1396975, at *1 (N.D.N.Y. Mar.

28, 2019) (quoting <u>Cunningham v. Town of Ellicott</u>, No. 04 CV 301, 2007 WL 1756502, at

*4 (W.D.N.Y. June 18, 2007)); <u>see</u> <u>also</u> <u>Caruolo v. John Crane, Inc.</u>, 226 F.3d 46, 54 (2d

Cir. 2000) ("A motion for a new trial ordinarily should not be granted unless the trial court is

convinced that the jury has reached a seriously erroneous result or that the verdict is a

miscarriage of justice.").  However, "[c]ourts are not free to reweigh the evidence and set

aside the jury verdict merely because the jury could have drawn different inferences or

conclusions or because judges feel that other results are more reasonable.'" <u>Suggs v. Port

Auth. of New York & New Jersey</u>, No. 97 CIV. 4026 (RPP), 2001 WL 13340, at *1

(S.D.N.Y. Jan. 5, 2001) (quoting <u>Tennant v. Peoria & P.U. Ry. Co.</u>, 321 U.S. 29, 35

(1944)).

> Nevertheless, "trial judges must exercise their ability to weigh
> credibility with caution and great restraint, as a judge should
> rarely disturb a jury's evaluation of a witness's credibility, . . .

4

> and may not freely substitute his or her assessment of the
> credibility of witnesses for that of the jury simply because the
> judge disagrees with the jury . . . ."

Congilaro v. Crown Equip. Corp., No. 5:09-CV-1452 (FJS/TWD), 2013 WL 5346714, at *2 (N.D.N.Y. Sept. 23, 2013) (quoting Raedle v. Credit Agricole Indosuez, 670 F.3d 411 (2d Cir. 2012)) (additional internal quotation marks omitted). The standard for granting such a motion is high and rulings on motions under Rule 59(a) "are committed to the sound discretion of the district court." Somerville v. Saunders, No. 9:11-CV-556 (MAD/DEP), 2014 WL 1679950, at *1 (N.D.N.Y. Apr. 28, 2014) (quoting Severino v. Am. Airlines, No. 07 CV 941, 2009 WL 1810014, at *2 (S.D.N.Y. June 24, 2009) (additional citations omitted)).

## III. Arguments

### A. Plaintiff's Arguments

Plaintiff contends that the verdict is contrary to law, not sustained by sufficient evidence, against the weight of the evidence, and against the law and evidence. Dkt. No. 78-1 at 2. Thus, plaintiff urges this Court to vacate the jury's verdict and award a new trial. Id. Specifically, plaintiff argues that the jury's verdict on informed consent– Jury Verdict Question 1 – must be vacated as "Defendants have failed to prove any facts that negate or disprove that Defendants failed to provide at least 2 of the five elements of Informed Consent prior to the surgery of January 2, 2014[,]" the risks of no procedure, provide non-surgical alternatives, and provide all of the risks of actual surgery. Id. at 3-12.

Next, plaintiff argues that "Plaintiff proved all facts sufficient to constitute that Defendants were negligent in providing services during the operation of January 2, 2014

relating to the hammer toe corrections for toes 2, 3, and 4, and as a result thereof, the Jury

credited Dr. Boc, rejected Dr. Mann's conclusory opinion, and properly returned a verdict

for Plaintiff under Jury Verdict Question Six." Dkt. No. 78-1 at 12-13. Plaintiff also argues

that defendants failed to rebut plaintiff's proof that she suffered damages from the claw toe

correction; thus, the jury's conclusion that plaintiff suffered no damages is "not based on

the record" as

> Plaintiff has proved all facts sufficient to constitute that
> Defendants['] negligence during the operation of January 2,
> 2014 relating to the hammer toe corrections for toes 2, 3, and 4,
> was a substantial actor in causing SOME harm to Plaintiff even
> if said negligence was not the cause of all the harm to Plaintiff.

Id. at 13. Plaintiff contends further:

> because the Jury found that Defendants were negligent during
> the hammer toe correction, and because Defendants did not
> submit proof of any kind that the deviation was not a substantial
> factor in causing the injuries to Plaintiff, the jury's answer to
> Question 7 as 'No' is against the weight of all evidence
> introduced into trial and must be based on their inability to
> understand the uncontested proof.

Id. at 14.

As for the drop foot issue, plaintiff contends that defendants merely presented

evidence that plaintiff did not suffer a neurological injury to the peroneal nerve causing

drop foot, but that "[n]either of Defendants' experts negated or disproved that Plaintiff was

suffering from drop foot post-surgery." Dkt. No. 78-1 at 15. Finally, plaintiff argues that the

jury's answer to Jury Question Four was against the weight of the evidence because she

proved that defendants were negligent in performing the left lapidus procedure, and

defendants failed to rebut Dr. Boc's testimony that the procedure was negligently

6

performed and resulted in injury to plaintiff. Dkt. No. 78-1 at 16.

## B. Defendants' Arguments

As to the informed consent issue, defendants argue that "there is sufficient evidence in the Record to support the jury's verdict in this regard." Dkt. No. 80-7 at 4. Defendants contend that plaintiff "signed an informed consent form stating that she was fully informed of all the risks and benefits of the surgery, including not having surgery." Id. Further, on cross-examination, "plaintiff admitted that she was offered the option of no surgery and that she knew there were no risks to not having the surgery." Id. Defendants also point out that plaintiff's brother testified that "plaintiff had been using different shoes and heavier socks but was still complaining about irritation to her left foot." Id. Defendants note that "it is undisputed that the plaintiff also spoke with her psychiatrist, Dr. Chazin, to obtain clearance for surgery." Id. Defendants contend that the jury need not accept plaintiff's version of events merely because the presurgical office note is missing and Dr. Maxian does not have an independent recollection of the presurgical office consultation. Id. Instead, defendants argue, "all the contemporaneous documentation that does exist, including the surgical booking sheet, the pre-surgery testing documents, the informed consent forms signed by the plaintiff, the 'time out' documents, the presurgical forms and nurses' notes from Ellis Hospital all reference screws and plates, a claw toe correction and a gastroc slide," demonstrating that plaintiff received informed consent for the procedures performed. Dkt. No. 80-7 at 5.

Defendants argue that Dr. Maxian testified as to her custom and practice of

explaining the risks of surgery and to the extent Dr. Maxian did not explain certain "allegedly foreseeable risks of surgery" such as "numbness, pain, need for physical therapy, swelling and smaller subsequent surgeries," "[f]rom all of the trial testimony and records in evidence, it is certainly clear that a jury would have more than sufficient basis to find that the plaintiff was aware that there would be pain and swelling following the surgery." Dkt. No. 80-7 at 5. Further, Dr. Mann and Dr. Maxian testified that physical therapy is not typically required following this surgery. Id. at 6. Thus, defendants argue that the jury "clearly made credibility determinations with regard to both lay and expert witnesses and the jury's determination that Dr. Maxian provided informed consent to the plaintiff is not seriously erroneous or a miscarriage of justice as a matter of law." Id.

Addressing the jury's verdict concluding that plaintiff suffered no damages as a result of the claw toe correction, defendant contends that plaintiff's evidence failed to demonstrate that plaintiff suffered damage due to the placement of the K wires. Dkt. No. 80-7 at 6-8. Defendants argue that Dr. Boc's testimony did "not state with any detail what type of specific damage resulted or whether it was permanent. Nor does he describe the nature or extent of the nerve damage that may have been caused by the k-wires or cite to any evidence in the record supporting any damage to the nerves or tissues in the plaintiff's mid-foot." Id.

Addressing plaintiff's argument that the weight of the evidence demonstrated that plaintiff suffered from drop foot as a result of the placement of the K-wires, defendants argue that the jury was permitted to rely on the expert testimony and physical therapy records demonstrating that plaintiff "did not sustain any neurological injury causing a drop

foot." Dkt. No. 80-7 at 7.  Finally, defendant argues that the verdict with respect to the left lapidus procedure is not against the weight of the evidence because despite Dr. Boc's testimony, "there was extensive documentary evidence and testimony to the contrary."  Id. at 9.

## IV.  Analysis

### A.  Informed Consent

Plaintiff essentially argues that because Dr. Maxian could not recall the informed consent conversation she discussed with plaintiff, there is no doctor's note recording the discussion, and because, when testifying about her usual warnings, Dr. Maxian did not address all nonsurgical alternatives and  risks and complications of the surgery, it cannot be said that she provided informed consent.  Dkt. No. 78-1.  Instead, plaintiff contends that "Defendants admitted to not having satisfied prongs 4 and 5 and that the weight of the evidence shows they satisfied only part of prong 3."  Dkt. No. 82 at 3.  Based on this admission, even if the jury had disregarded "the unrebutted testimony of both Plaintiff and Tina Audino," "as a matter of law . . . the jury had no basis to disregard Defendant Maxian's admission that she failed to provide the 4th and 5th prongs."  Id. at 5.  Plaintiff contends that the December 26, 2013, hospital informed consent form she signed did not suffice to amount to informed consent because it requires plaintiff to affirm that she was fully advised of the nature and extent of surgery, but plaintiff completed the document under anesthesia and after she had already agreed to surgery on November 27, 2013.  Id.

The Court finds that the jury's finding with respect to the informed consent question

is not a seriously erroneous result, a miscarriage of justice, or against the weight of the

evidence. The jury was provided the following instruction relating to informed consent:

> Before obtaining a patient's consent to perform an operation or
> invasive diagnostic procedure or use medication, a doctor has
> the duty to provide certain information concerning what the
> doctor proposes to do; the alternatives to that operation,
> procedure, or medication; and the reasonably foreseeable risks

of such operation, procedure or medication. It is the doctor's duty to explain, in words that
are understandable to the patient, all of the facts that would be explained by a reasonable
medical practitioner so that when the patient does, in fact, consent, that consent is given
with an awareness of (1) the patient's existing physical condition; (2) the purposes and
advantages of the operation, procedure, or medication; (3) the reasonably foreseeable
risks to the patient's health or life which the operation, procedure, or medication may
impose; (4) the risks involved to the patient if there is no operation, procedure or use of
medication; and (5) the available alternatives and the risks and advantages of those
alternatives. The first question on this issue that you will be called upon to answer is
whether the defendant, before obtaining plaintiff's consent, provided appropriate
information.

Jury Instructions at 15, attached; see New York Public Health Law § 2805-d.

Plaintiff and her sister both testified before the jury, contending that they were

> "under the impression that the operation was a simple
> bunionectomy and were not provided the risks of the actual
> reconstructive surgery conducted (left lapidus, claw toe
> correction and gastroc slide) . . . , they were not told of the risks
> and benefits of no surgery at all and they were not told of
> available nonsurgical alternatives and the risks and benefits of
> those alternatives."

Dkt. No. 78-1 at 3. Plaintiff contends that her and Ms. Audino's testimony is undisputed

because there is no doctor's note from the consultation appointment, and because Dr.

Maxian had no independent recollection of this appointment. Id. However, the jury was

free to find the testimony of both plaintiff and Ms. Audino to be incredible. Insofar as

plaintiff contends that the jury could not have found that plaintiff received informed consent

because Dr. Maxian's testimony about her usual discussion still failed to hit all of the

10

required prongs of informed consent – it did not express the alternatives to surgery, no surgery, or every risk – the record demonstrates why Dr. Maxian's usual recitation sufficed. Dr. Maxian testified that she did not have a specific recollection of the informed consent conversation she had with plaintiff. It is clear that the office note from that date is missing, as are some of plaintiff's other records. However, Dr. Maxian explained that she did not likely explicitly tell plaintiff that an alternative is no surgery, as plaintiff knew the surgery was elective and because she came to the office desiring the surgery. Dkt. No. 78-2 at 87. Dr. Maxian explained that she did not likely tell plaintiff that she could use wider shoes as an alterative to surgery because plaintiff had already tried wider shoes. Dkt. No. 78-2 at 87. Further, plaintiff testified that she knew that not having surgery was an option, there were no risks in not having surgery, and that Dr. Maxian informed her of this option. Id.; dkt. no. 80-2 at 128.

Dr. Maxian testified that she would not have told plaintiff about numbness as a risk of surgery as numbness is "usually transient." Dkt. No. 78-89. Further, she did not tell plaintiff that she could take "up to a year to recover" as recovery is usually six months, and did not tell her she would experience "three years of pain" as that kind of outcome is "unusual." Id. at 78-79, 91. Similarly, Dr. Maxian explained that she likely did not present "nonunion" as a risk of surgery to plaintiff because it is "pretty rare." Id. at 90. Further, Dr. Maxian testified that she did not explain to plaintiff that she may need physical therapy post-surgery as she does not usually send patients to physical therapy. Dkt. No. 78-2 at 91. In addition, Dr. Mann testified that he does not personally inform patients pre-surgery that physical therapy can be a risk of the procedure because he does not consider it to be

11

a risk, and that, further, in plaintiff's case, physical therapy was not a nonsurgical alternative as it would be "useless" for a "fixed deformity."  Dkt. No. 80-6 at 102-03.

As the jury was charged, informed consent standard requires Dr. Maxian to discuss all "reasonably foreseeable" risks of surgery.[2]  See Jury Instructions at 16 (attached). Neither the standard nor the charge states that the doctor must inform the patient of require every possible risk, no matter how low that risk may be.  Although plaintiff argues that the hospital consent form nor plaintiff or her sister's credibility should have been dispositive for the jury as Dr. Maxian herself was still required to provide plaintiff with each and every risk and alterative to surgery, the jury was free to reasonably conclude that Dr. Maxian provided plaintiff with all of the <u>reasonably</u> <u>foreseeable</u> risks of surgery, that the alternatives of no surgery or deeper shoes were obvious and that plaintiff was aware that surgery was not an option and that she had already unsuccessfully tried different shoes, and that plaintiff was aware of both the specific surgery that was to be performed and the reasonably foreseeable risks of that surgery.

Accordingly, it is not against the weight of the law and evidence for the jury to have concluded that Dr. Maxian provided sufficient informed consent to plaintiff.   "A review of the testimony and evidence at trial . . . reveals that the jury's verdict is within the realm of

---

[2] See, e.g., Thibault v. Siouffi, No. 8:12-CV-1183 (BKS/RFT), 2015 WL 12564222, at *7 N.D.N.Y. Mar. 11, 2015) ("'To establish a cause of action [to recover damages] for malpractice based on lack of informed consent, a plaintiff must prove (1) that the person providing the professional treatment failed to disclose alternatives thereto and failed to inform the patient of *reasonably foreseeable* risks associated with the treatment, and the alternatives, that a reasonable medical practitioner would have disclosed in the same circumstances, (2) that a reasonably prudent patient in the same position would not have undergone the treatment if he or she had been fully informed, and (3) that the lack of informed consent is a proximate cause of the injury.'" (quoting Magel v. John T. Mather Memorial Hosp., 95 A.D.3d 1081, 1082, 945 N.Y.S.2d 113 (N.Y. App. Div. 2012), and citing N.Y. Pub. Health Law § 2805-d(1), (3) (additional citation omitted and emphasis added)).

reasonableness and does not approach the threshold of being the sort of 'seriously erroneous result' that would constitute a miscarriage of justice and necessitate a new trial." Albin v. Schulman, No. 94 CIV. 7688 (RWS), 1997 WL 473554, at *3 (S.D.N.Y. Aug. 18, 1997) (citing Paper Corp. of U.S. v. Schoeller Tech. Papers, Inc., 807 F.Supp. 337, 347 (S.D.N.Y. 1992); Song v. Ives Laboratories, Inc., 957 F.2d 1041, 1047 (2d Cir. 1992). Accordingly, plaintiff's motion for a new trial on this basis is denied.

## B. Claw Toe Correction - Damages

Plaintiff argues that the jury's verdict for the claw toe correction surgery means that "the jury credited Dr. Boc" and "rejected Dr. Mann's conclusory opinion," but that its finding that no damages resulted from the malpractice was "contrary to the Record and Testimony" was "clearly erroneous and against the weight of the evidence." Dkt. No. 82 at 9. Plaintiff contends that Dr. Boc's testimony – a portion of which was read back to the jury – explicitly stated "that there were injuries directly related to the claw toe correction as stated by Dr. Boc. Specifically, this included damage to the structure of the foot and nerve damage in the foot (as opposed to the peroneal nerve)." Dkt. No. 82 at 9. Plaintiff argues that "Dr. Mann never addressed this issue at all for the Defendants." Id. at 10. Plaintiff further argues that defendants' opposition "is based on a misunderstanding of their own expert, Dr. Storey" as "Dr. Storey merely found that there was no injury to the peroneal nerve which caused the foot drop. He simply testified that while Dr. Hunter did find that drop foot had occurred, he did not attribute it to peroneal nerve damage." Id. Plaintiff further contends that

> Dr. Storey merely found that there was no injury to the peroneal nerve which caused the drop foot. He simply testified that while Dr. Hunter did find that drop foot had occurred, he did not attribute it to peroneal nerve damage. Dr. Storey did not state that there was no nerve damage whatsoever as he was not tasked with that time of IME review. He was only asked to address whether there was peroneal nerve damage.

Id. Plaintiff also focuses on the fact that defendants did not ask Dr. Storey to complete an independent medical exam ("IME"). Id.

The Court finds that the Jury's failure to conclude, in Jury Question 7, that defendants' conduct was a substantial factor in causing harm to plaintiff, was not against the weight of the evidence. Dkt. No. 76 at 3. Although plaintiff contends that defendants failed to offer testimony demonstrating that plaintiff suffered no injury to the peroneal nerve or no damage as a result of the claw toe correction and placement of the k-wires, the jury was free to make a credibility determination. Plaintiff contends that Dr. Boc's testimony proved that

> defendants['] negligence during the hammer toe correction was a substantial factor in causing Plaintiff to suffer from, including but not limited to: (1) structural damage to the midtarsal joint; (2) excessive soft tissue swelling damaging the nerves; (3) loss of range of motion and complications described as 'drop foot'; (4) severe and permanent numbness; (5) osteoarthritis; (6) pain in the left foot and leg; (7) abnormal gait/difficulty walking; and (8) chronic neuropathic pain.

Dkt. No. 82 at 10.

Plaintiff further points out that during trial, jurors sent the Court the following note: "Can we hear part of Dr. Boc's testimony where he talks about the damage done from the pins being too long and inserted incorrectly and the pins being too long on the bunion surgery." Dkt. No. 77 at 3. Plaintiff contends that this note, and the fact that the jurors

answered "yes" to Juror Question Six, concluding that defendants were negligent in

providing services during the January 2, 2014, operation "relating to the hammer toe

corrections for toes 2, 3, and 4" means that the jury credited Dr. Boc and rejected Dr.

Mann's testimony. Dkt. No. 78-1 at 12-13. However, at oral argument, this Court asked

counsel whether it was "possible the jury found Dr. Boc credible with respect to the issue of

the insertion of the pins but rejected his testimony about the fact it caused damage." Dkt.

No. 83 at 8. Plaintiff's counsel conceded that this is possible, and that "normally, you

would think that [the jury] could make that credibility decision, but then when you

superimpose Dr. Mann's opposition, which was nothing." Id. The Court and plaintiff's

counsel further engaged in the following dialogue:

> The Court: Suppose Dr. Mann hadn't testified. Suppose there
> was no Dr. Mann.
> Mr. Ferlazzo: Then there would be uncontested proof.
> The Court: Doesn't the jury have the right to reject that proof
> though?
> Mr. Ferlazzo: They have the right to reject inadequate proof, but
> when they have the credibility that they've already
> demonstrated that he has.
> The Court: . . . . Isn't it possible they found him [Dr. Boc]
> credible with respect to the issue of the insertion of the pins but
> not credible with respect to the fact that the pins caused
> damage?
> Mr. Ferlazzo: Of course, Judge. They could make that
> credibility decision.
> The Court: Doesn't that address the issue of the claw toe then if
> the jury made that credibility determination?
> Mr. Ferlazzo: It addresses it.
> The Court: Doesn't it resolve it?
> Mr. Ferlazzo: Is it possible that they could conceive of, could do
> that? Yes, it's conceivable. Does it resolve it? I still think it's the
> weight of the evidence. I don't know what Dr. Boc said that
> would show that he didn't have credibility.
> The Court: Could they just not find him credible though? Are
> you saying if Dr. Boc testifies to X and no one else contradicts

> it, the jury is required to accept X?
> Mr. Ferlazzo: Judge, we know that the rule is no.  They can
> accept some but not all of any witness, not just Dr. Boc.  So
> that's the law that the judge charged.  That's the accurate law,
> but in this particular case, I think the fact that they found him
> credible for the harder issue, which was: Was there a deviation
> of the standard? But then to say on the damages part where it
> was uncontested and not disputed, that's where Dr. Mann
> comes in.  There was no dispute.

Dkt. No. 83 at 9-10.

It is clear to the Court that plaintiff disagrees with the jury's credibility determination; however, although plaintiff finds Dr. Mann to be fully incredible, the jury's apparent conclusion otherwise is not seriously erroneous.  Plaintiff argues that defendants' expert, Dr. Mann "did not testify that the injuries suffered by Plaintiff were not a result, in part, of the wire placement" nor did his report make such a conclusion. Dkt. No. 78-1 at 14.  Thus, plaintiff argues that defendants "fail to provide record support to the Jury's illogical conclusion that this deviation from the standard of care in putting in pins too deep and into nerves and tendons did not cause ANY damage."  Dkt. No. 78-1. Defendants argue that, dkt. no. 80-7 at 6, Dr. Boc's testimony did not "state with any detail what type of specific damage resulted or whether it was permanent.  Nor does he describe the nature or extent of the nerve damage that may have been caused by the k-wires or cite to any evidence in the record supporting any damage to the nerves or tissues in the plaintiff's mid-foot."  Dkt. No. 80-7 at 6.  Defendants further argue that Dr. Todd, plaintiff's neurologist, did not testify "regarding there being any nerve damage to the plaintiff's mid-foot where the K wires were temporarily placed."  Id. at 7.

Insofar as plaintiff argues that defendants did not put forward any evidence to rebut

16

Dr. Boc's testimony supporting a conclusion that plaintiff suffered damages as a result of the claw toe corrections/pins, and, thus, the jury was facing "uncontested proof" on that issue, the Court disagrees. The jury was not required to accept Dr. Boc's testimony as a whole. It is entirely within the jury's purview to find portions of his testimony credible and to reject other portions. Although plaintiff argues that the jury should have concluded that plaintiff suffered from "some" injury, even if non-neurological in nature, review of the testimony reveals that Dr. Boc concluded that because the k-wires "missed the actual bone structures where they were supposed to be intended to go, and because they were penetrated so far deep, contributing to nerve problems and pathology which she experienced, creating – contributing to the portion of malalignment which will occur later on." Dkt. No. 80-4 at 54.[3] Thus, the focus of his testimony of plaintiff's injuries from the k-wire stemmed from neurological injury. The jury could have reasonably concluded that Dr. Boc did not demonstrate that plaintiff suffered neurological damage or that she suffered some other, nonneurological injury from the k-wire placement. Dr. Mann testified that the physical therapy records demonstrated that plaintiff had good motion and was able to dorsiflex and there was no evidence that she had "Extreme equinis." Dkt. No. 80-6 at 34-36. Thus, there was expert evidence before the jury that plaintiff did not suffer injury from the k-wires. Even if the jury concluded that Dr. Mann did not rebut Dr. Boc's testimony or that defendants did not submit sufficient proof as to a lack of injury, the jury could have concluded that plaintiff simply did not meet her burden on this issue. Their conclusion on

---

[3] See also Boc Testimony at 53 ("because [the pins] were penetrated so far deep, contributing to nerve problems and pathology which she had experienced, creating– contributing to the portion of malalignment which will occur later on.")

this ground is not against the weight of the evidence nor a miscarriage of justice warranting reversal.  Accordingly, plaintiff's motion is denied on this ground.

## C. Drop Foot

Plaintiff also argues that the jurors erred in concluding that plaintiff did not suffer from drop foot as a result of defendants' malpractice.  Dkt. No. 78-1 at 14-15; Dkt. No. 82 at 11-12.  Plaintiff argues that the evidence defendants presented merely suggested that plaintiff did not suffer drop foot from the crushing of the peroneal nerve, but that they presented no evidence whether plaintiff suffered other nerve damage or muscular damage.  Dkt. No. 78-1 at 14.  Further, plaintiff argues that Dr. Storey's testimony does not "rule out Dr. Boc's direct testimony and the overwhelming proof by all other treating doctors that the surgery caused various types of damages.  Neither of Defendants' experts negated or disproved that Plaintiff was suffering from drop foot post-surgery."  Id.  Plaintiff argues further on reply that defendants' expert

> Dr. Storey did not conclude that plaintiff did not suffer from drop foot.  Instead, Dr. Storey merely found that there was no injury to the peroneal nerve which caused the foot drop.  He simply testified that while Dr. Hunter did find that foot drop had occurred, he did not attribute it to peroneal nerve damage . . . . Dr. Storey did not state that there was no nerve damage whatsoever as he was not tasked with that type of IME review. He was only asked to address whether there was peroneal nerve damage.

Dkt. No. 82 at 10.

Defendants argue that Dr. Storey "gave extensive testimony interpreting the EMG and nerve conduction tests performed by the plaintiff's own treating neurologist and

conclusively establishing that the plaintiff did not sustain any neurological injury causing a drop foot." Dkt. No. 80-7 at 7. Further, defendants point to plaintiff's physical therapy records, showing that plaintiff "was able to dorsiflex and plantar flex her left foot which would have been impossible had the plaintiff sustained an injury to her peroneal nerve." Dkt. No. 80-7 at 8. Defendants also argue that plaintiff's expert witnesses "contradict each other with regard to the location of the alleged nerve injury and the apparent cause[,]" with Dr. Todd testifying "that the injury to the peroneal nerve occurred above the knee" and Dr. Boc testifying that "the pin placement did not cause the peroneal foot drop and he did not believe the tourniquet was a cause of the foot drop"; rather, the foot drop "was a result of swelling from the post-surgical dressing." Dkt. No. 80-7 at 8.

As defendants point out, although both of plaintiff's experts agreed that plaintiff had foot drop, they disagreed with the cause. Dr. Todd testified that plaintiff suffered injury to the peroneal nerve which occurred above the knee and was due to the tourniquet placement. Dr. Boc concluded that plaintiff suffered foot drop due to the post-surgical dressing, not as a result of the pin placement. Further, the jury received testimony and evidence regarding plaintiff's physical therapy records. The physical therapy records documented that plaintiff could dorsiflex and plantar flex her foot. As Dr. Storey testified, when a person has foot drop she "can't elevate the foot at the ankle and so if the leg was lifted up, it will drop down and hang, not be able to be raised." Dkt. No. 80-6 at 136. He further explained that if there is nerve damage, the person will not be able to elevate the foot. Id. Although plaintiff contends that there was no evidence presented supporting a conclusion that plaintiff did not suffer drop foot – only that plaintiff did not suffer drop foot

due to a peroneal nerve injury, review of the trial record reveals that the jury could have reasonably concluded that plaintiff did not suffer drop foot at all, based on Dr. Storey's testimony and the physical therapy records.

Moreover, the jury was presented with evidence that called into question plaintiff's expert testimony and documentary evidence related to the drop foot. Defendants presented both evidence that plaintiff did not suffer a peroneal nerve injury and evidence that plaintiff did not suffer from drop foot. Dr. Storey testified that, in his opinion, the Sudoscan, which was the test Dr. Mowen used that resulted in his diagnoses of foot drop, was not a very useful tool for making this kind of diagnosis Dkt. No. 80-6 at 145. However, Dr. Storey testified that, even considering the Sudoscan, Dr. Mowen's results from the Sudoscan were "normal," and that the results have no bearing on whether plaintiff had a foot drop from a neurological injury. Id. at 162-63. Dr. Storey next indicated that Dr. Hunter performed an EMG, and that Dr. Hunter's "overall impression was that there was no definite evidence of a peroneal nerve injury." Id. at 145. He also noted that Dr. Hunter observed "no clear steppage," and testified that "steppage would be – if someone had that, that would be a sign of a foot drop." Id. at 145. Dr. Storey further testified that, based on Dr. Hunter's EMG results, there is no indication that there is a difference between plaintiff's left leg and right leg with respect to the peroneal nerves; thus, his opinion was that Dr. Hunter's testing revealed no injury to plaintiff's left peroneal nerve. Id. at 150. Dr. Storey further noted that Dr. Hunter had concluded that "there was a general neuropathy, that something was wrong with the nerves on both sides there." Id. at 151. Dr. Storey also recounted Dr. Hunter's conclusion that there "was no clear evidence to suggest a left

20

peroneal neuropathy or some other focal neuropathy," including left lumbar radiculopathy. Id. at 152.

Dr. Storey also reviewed the findings of plaintiff's neurologist, Dr. Todd, and testified that Dr. Todd's conclusion of "amplitude difference" between plaintiff's left and right feet "doesn't fit with the rest of the data." Dkt. No. 80-6 at 154. Dr. Storey explained that Dr. Todd's additional testing did not demonstrate an injury to the peroneal nerve, and that if a person had a peroneal nerve injury, "one of the main symptoms would be the foot drop, failure to dorsiflex." Id. at 156. Next, Dr. Storey disagreed with the conclusion of plaintiff's expert, Dr. Boc, that plaintiff suffered a foot drop caused by an injury to the peroneal nerve due to the post-surgical dressing as "the dressing was not in a location that would have compressed the nerve in an area that would have caused the foot drop." Dkt. No. 80-6 at 157. Similarly, Dr. Storey concluded that the placement of the tourniquet also could not have injured the peroneal nerve, as if the tourniquet was placed where Dr. Todd estimated, there would have been damage to other nerves, including tibial, sciatic, and femoral nerves, and Dr. Storey's review of the records led him to conclude that plaintiff did not have such nerve damage as she did not have range of motion limitations in other parts of her leg. Id. at 158. Dr. Storey concluded, from his review of plaintiff's medical records and testing, that there is no neurological reason as to why plaintiff would be unable to move her left foot, including dorsiflex and plantar flex. Id. at 159. Ultimately, Dr. Storey concluded that there was no indication that plaintiff suffered nerve damage to her left foot that was not also present in her right foot. Id. at 160. Further, Dr. Mann testified that based on his review of Dr. Downey's records, there were no findings in his report indicative of a foot

drop. Dkt. No. 80-6 at 40.

In sum, the jury was presented with evidence from plaintiff suggesting that plaintiff suffered foot drop as a result of either nerve damage due to placement of the pins or of the tourniquet. However, they were also presented with evidence from defendants, suggesting that plaintiff's nerve studies did not demonstrate foot drop, rather, generalized neuropathy in both feet. Defendants also produced evidence of plaintiff's physical therapy records showing the ability to dorisflex and plantar flex, which, when combined with Dr. Storey's testimony that someone with an inability to dorsiflex or plantar flex would not have foot drop, reasonably supports the jury's conclusion that plaintiff did not suffer foot drop as a result of the surgery. Thus, despite plaintiff's arguments that (1) defendants did not rebut plaintiff's expert testimony that plaintiff suffered foot drop as a result of defendants' negligence, or (2) defendants presented only evidence suggesting that plaintiff did not suffer injury to her peroneal nerve, review of the trial transcripts and evidence reveal that the jury was given evidence supporting both sides. That the jury made a credibility determination to conclude that defendants' expert testimony and evidence on this argument was more credible or that plaintiff's expert testimony or evidence was not credible, and, thus, that plaintiff did not meet her burden of proof, such conclusion not against the weight of the evidence, against the law and evidence, or contrary to the law. Accordingly, plaintiff's motion is denied on this ground.

### D. Left Lapidus

Plaintiff argues that the jury's response to Jury Question Four (Dkt. No. 76 at 2) is

against the weight of the evidence. Dkt. No. 78-1 at 16. Plaintiff contends that Dr. Boc's

testimony demonstrated that defendants were negligent in performing plaintiff's left lapidus

procedure and that defendants "failed to prove any facts that negate or disprove that

Defendants were negligent in providing services during the January 2, 2014 operation

relating to the left lapidus bunionectomy procedure." Dkt. No. 78-1 at 16. Defendants also

point to Dr. Maxian's decision to "not return to the stand to rebut the testimony by Dr. Boc

that her placement of the screws was improper" as an "admission by conduct." Id. at 16.

Further, defendants note that Dr. Mann did not testify as to the number of surgeries he

performed of this nature, and that Dr. Mann was a general surgeon, whereas Dr. Boc

testified to having performed thousands of this exact surgery and is a specialist. Id. at 17.

Plaintiff also argues that Dr. Mann's testimony on the left lapidus procedure was

"conclusory at best, and provided no support to negate or disprove Dr. Boc's testimony"

regarding placement of the plates and screws. Id. at 17. Plaintiff also contends that Dr.

Maxian's testimony "confirms the opinion of Dr. Boc that the screw was placed improperly

and caused damages in the precise area of where it was improperly inserted. This

damage issue was never reached by the jury, but it is clearly supported by the record, and

not negated or rebutted but in fact admitted by Defendant Maxian." Dkt. No. 78-1 at 17.

Further, plaintiff argues that defendants, in

> rely[ing] on a passing observation by Dr. Harmelin that, within 4
> months of the surgery, the patient had undergone a
> 'radiologically excellent' Lapidus procedure . . . ignore . . . the
> remainder of Dr. Harmelin's records of May 6, 2014 which show
> that Plaintiff's x-ray of April 21, 2014 showed a raising of the
> arch (elevatus), no evidence of bony bridging on the first toe
> (non-union/malunion), severe limitation of motion, and severe
> pain and stiffness. They also ignore his recommendation to

surgeons who do 'salvage' procedures.

Dkt. No. 82 at 13.

Defendants argue that plaintiff ignores the fact that they presented evidence to contradict Dr. Boc's testimony as there was evidence from Dr. Harmelin, Dr. Maxian, and Dr. Mann suggesting that plaintiff's surgery was properly performed, including her placement of the screws in hardware. Dkt. No. 80-7 at 8. Defendants specifically point to Dr. Harmelin's conclusion that plaintiff underwent a "radiologically excellent reduction of the Lapidus procedure with relocation of the metatarsal phalangeal joint and sesamoid bones," and Dr. Sheremeata's December 2018 weight-bearing x-rays showing "that the plaintiff did not have any hardware or the way the plaintiff's left Lapidus procedure healed." Id. at 9.

In reply, plaintiff accuses defendants of "mistat[ing] the Record by claiming that Dr. Maxian did not find any evidence of non-union or malunion and the plate and screws were properly placed," by contending that "Dr. Maxian merely testified that she placed the screws and plates where she intended to. She did not testify that they were properly placed." Further, plaintiff points to Dr. Mann's April 21, 2014, office note observing hallux elevatus on the x-ray lateral view, Dr. Downey's testimony of "severe metatarsus primus elavatus." Dkt. No. 82 at 13-14.

It is no secret to the Court that plaintiff strongly believes that Dr. Mann was not a credible expert witness. See Dkt. No. 82 at 13 ("Dr. Mann's conclusory testimony on all issues was simply worthless and, as Defendants point out . . ., the Court has the right to consider the credibility of witnesses. This rule is especially appropriate for Dr. Mann, who clearly was unprepared, and unprofessional in his conduct to counsel and even argued

with the Court."). However, plaintiff's criticism of Dr. Mann's experience, trial testimony, or trial performance does not require the jury or the Court to find him lacking in credibility. Plaintiff implicitly suggests that because Dr. Boc testified that he has "vast experience" and has performed this surgery thousands of times, whereas Dr. Mann did not testify as to the number of times he performed the surgery and "freely admit[ted] that he was a general surgeon who performed surgery on all parts of the body," it was illogical and against the weight of the evidence for the jury to find Dr. Mann more credible on any issue relating to the surgery or plaintiff's outcome. Dkt. No. 78-1 at 17. However, that is not the standard. Dr. Mann was properly qualified as an expert. The jury had before it Dr. Mann's credentials and his testimony. The jury's decision to find Dr. Mann more credible, or to find only portions of Dr. Boc's testimony credible, is within their purview and is not against the weight of the evidence or the law.

Additionally, the jury was presented with evidence from which they could reasonably conclude that any consequences plaintiff may have experienced post-surgery did not necessarily have to flow from acts of negligence. Indeed, Dr. Maxian testified that she placed the screws where she intended. Dkt. No. 78-2 at 103, 115. She further testified that she used locking screws for "more stable construct," and that after surgery, the hardware was intact. Dkt. No. 78-2 at 114, 130, 132. Dr. Maxian admitted that plaintiff eventually began to experience hallux elevatus and explained that this can be a consequence of the surgery, stating "[h]ardware can sometimes irritate the patient so you take it out once you think you've got a stable union." Dkt. No. 78-2 at 136, 138. Moreover, Dr. Mann testified that it is "not uncommon to get a loose screw. They can just loosen up

. . . lose their bite in the bone" and that the bone is "dynamic tissue [that] resorbs around the screw tops holding it really strongly and they can loosen up." Dkt. No. 80-6 at 32. He further testified that "[i]t's pretty common to have their plates and screw [taken] out." Id.

Plaintiff appears to suggest that, because there was evidence presented that plaintiff's bones were not fully fusing and that subsequent surgeries may be needed, Dr. Maxian committed malpractice in her performance of the left lapidus surgery. Dkt. No. 82 at 13. However, as indicated, the jury was presented with evidence to the contrary. Dr. Mann testified that even if plaintiff had nonunion, it did not mean that Dr. Maxian performed the surgery improperly as "nonunions can come from a multitude of . . . causes. [Y]ou can fix something perfectly and still doesn't heal and you can have a bone that looks like it should never heal and they sometimes do. Most bones actually do go on to heal no matter what but sometimes they don't." Dkt. No. 80-6 at 37-38. Dr. Mann explained that the complications plaintiff complained of does not mean that Dr. Maxian was negligent as such complications are

> part and parcel of all operations. There's no such thing as any surgery which – where all results are a hundred percent . . . . you can do everything right, you can do it within the standard of care, you can do your surgery well and you can still not have a good result, you can still have complications . . . [I]t does not mean when you have those things happen that the standard of care was not met.

Dkt. No. 80-6 at 46-47. Further, Dr. Mann testified that he did not believe plaintiff's results were as negative as defendants' experts concluded them to be. Unlike Dr. Downey, he believed that plaintiff's toe was in good alignment as all toes were pointing in the "correct direction and it's lined up . . . instead of pointing out like that like on the first film, they point

straight and everything is pointing where it's supposed to go." Id. at 38. Dr. Mann further testified that plaintiff's toe #2 was "in good position when it was placed in surgery" based on his review of the post-operative X-rays. Dkt. No. 80-6 at 46.

Again, although plaintiff passionately contends that "[d]efendants failed to prove any facts that negate or disprove that Defendants were negligent in providing services during the January 2, 2014 operation relating to the left lapidus bunionectomy procedure,"[4] the jury was presented with expert testimony contending that complications can arise even when the surgery is performed completely within the standard of care. For these reasons, the Court concludes that the jury's verdict with respect to the left lapidus procedure is not contrary to the law, sustained by insufficient evidence, against the weight of the evidence, or against the law and evidence. The Court is not "convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." United States v. Landau, 155 F.3d at 104. Accordingly, plaintiff's motion on this ground is denied.

## V.  CONCLUSION

For the reasons set forth herein, the Court finds that the jury's verdict is not against the clear weight of the evidence.

**WHEREFORE**, it is hereby

**ORDERED**, that plaintiff's Motion for a New Trial pursuant to Fed. R. Civ. P. 59 (dkt.

---

[4]  The Court is unconvinced that Dr. Maxian's strategic decision not to take the standard on rebuttal is "an admission by conduct" or that the jury should have taken any negative inference therefrom. Dkt. No. 78-1 at 16. That Dr. Maxian did not testify in rebuttal does not mean that the jury was required to give greater weight to the testimony of plaintiff's experts over defendants or their experts.

no. 78) is **DENIED**.

       **IT IS SO ORDERED**.

      Dated: September 10, 2019
             Albany, New York

Christian F. Hummel
U.S. Magistrate Judge